**Donald ROSS and Victoria J. Ross,
Plaintiffs–Appellants,**

v.

**Richard E. BOLTON, R.E. Bolton & Co.,
Inc., Forbes, Walsh, Kelly & Co., Inc.,
and Bear, Stearns & Co., Inc., Defendants,**

**Bear, Stearns & Co., Inc.,
Defendant–Appellee.**

No. 398, Docket 89–7662.

United States Court of Appeals,
Second Circuit.

Argued Dec. 22, 1989.

Decided May 30, 1990.

Daniel J. Gallagher, Saddle River, N.J., for plaintiffs-appellants.

Henry F. Minnerop (I. Scott Bieler, Brown & Wood, New York City, of counsel), for defendant-appellee, Bear, Stearns & Co., Inc.

Before TIMBERS, CARDAMONE, and PRATT, Circuit Judges.

CARDAMONE, Circuit Judge:

The principal question on this securities litigation appeal is whether a clearing firm may use the *in pari delicto* defense to bar an investor's suit to recover losses in connection with stock he purchased from an introducing firm. Because in this case no blame may be laid at the clearing firm's doorstep for the wrongs committed by the introducing firm, we think the defense should be available.

## BACKGROUND

R.E. Bolton & Company, Inc. (Bolton), a New York brokerage firm, was the principal market-maker in the securities of a company called Resort and Urban Timeshares, Inc. (RUTI securities), which were traded over-the-counter on the NASDAQ exchange. In 1981–82 the firm and its principal, Richard Bolton, initiated an illegal and complex stock parking scheme that created an appearance that these securities were being actively traded, and caused their price to rise despite the fact that the corporation's earnings had not increased. In December 1982 plaintiff Donald Ross, an employee of St. Lawrence Securities, Ltd. (St. Lawrence), a Canadian brokerage firm, received a telephone call from Richard Bolton. Bolton offered to sell Ross 26,900 units of RUTI securities at $17.50 a share, with the understanding that the units could be quickly resold at a higher price to another purchaser, Forbes, Walsh, Kelly & Co. (Forbes). Plaintiff purchased the RUTI shares in the account of

his daughter Victoria, and the trade was cleared by defendant Bear, Stearns & Co., Inc. (Bear Stearns) clearing agent for Bolton. Ross thereby jumped imprudently onto Bolton's stock parking gravy train but, unfortunately for him, it was already too late.

When he attempted to sell the 26,900 shares he had purchased, Forbes declined to buy them. Bolton had in the meanwhile become insolvent and could no longer keep its illegal parking scheme afloat. With its principal market-maker unable to maintain a market the bottom dropped out of RUTI securities, resulting in a large financial loss for the Rosses, and precipitating the instant litigation. Plaintiffs sued Richard Bolton and his company, and Forbes, and Bear Stearns under § 10(b) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. § 78j(b) (1988), SEC Rule 10b–5, 17 C.F.R. § 240.10b–5 (1989), under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 (1988), and under state common law fraud and § 352–c of the New York General Business Law.

The present appeal is taken by Donald and Victoria Ross from a judgment of the United States District Court for the Southern District of New York (Knapp, J.), which dismissed the appellants' amended complaint against Bear Stearns in two memorandum opinions and orders entered on April 6 and 11, 1989. Judge Knapp certified that, under Fed.R.Civ.P. 54(b), its orders should not be delayed from entry as final judgments. We affirm the district court's dismissal of appellants' complaints, but write in this case to discuss the *in pari delicto* defense raised by Bear Stearns, but not reached or decided by the district court.

## FACTS

It is helpful to an understanding of this appeal to trace the chronology of events from the initiation of the stock parking scheme onward. Bolton initiated its stock parking scheme through a series of purchases and sales in which it was positioned as both seller and buyer of the RUTI securities—i.e., Bolton sold the securities to

various investors and within a few days bought the stock back at a higher price than that at which it had been sold. The stock sometimes went through the hands of one or two intervening parties, who purchased the stock at progressively higher prices, notwithstanding that RUTI had no increase in earnings. In order to deceive Bear Stearns and the National Association of Securities Dealers (N.A.S.D.) into believing its net capital position was strong, Bolton also had been parking units of RUTI securities in customer accounts at above market prices. At the month-end clearance, when customers refused to acknowledge these spurious trades, Bolton cancelled them, thereby reversing the parked transactions, and causing it to return to its actual undercapitalized position.

As the clearing agent for these transactions, Bear Stearns over time had loaned money to Bolton on margin collateralized by securities owned by Bolton—principally RUTI securities. During the period between August 1981 and December 1982 the value of these securities was substantially less than the amount of collateral required to secure the loans. Bolton's account with Bear Stearns therefore was often under margin. In June 1982 the N.A.S.D. began scrutinizing Bolton's net capital position. Bear Stearns also had concerns about Bolton's solvency, and insisted that Bolton reduce its inventory of RUTI securities, imposed trading restrictions, and limited its margin loans to Bolton.

On November 12, 1982 Bear Stearns gave Bolton the 30-day notice required to terminate its clearing agreement. As a follow-up to the termination notice, Bear Stearns further tightened its restrictions on Bolton's trading, permitting only those trades that reduced Bolton's "long" inventory positions or were simultaneously matched to clear. As a result of discussions with Bolton about the firm's trading activities and its plans to reduce its inventory of RUTI securities, Bear Stearns reduced the margin credit it had previously extended.

On or about December 8 Bear Stearns began to wind up Bolton's account. It refused to release Bolton's assets to Securities Settlement Corporation, another clearing agency that had agreed to handle Bolton's trades after its relationship with Bear Stearns came to an end. On December 10 Bear Stearns "wrote off" $454,995 against Bolton's trading account, putting Bolton in a near insolvent position. Bear Stearns continued nonetheless to act as Bolton's clearing agent after December 12, 1982—the date the clearing agreement was to have been terminated.

It was at this point that Ross entered the picture. On December 14, 1982 St. Lawrence received a comparison—an invoice reflecting the sale of securities from one brokerage firm to another—dated December 8 from Bear Stearns indicating that St. Lawrence had purchased 26,900 units of RUTI from Bolton at $17.50 a share. The supposed purchase was a fictitious trade instigated as a part of Bolton's plan. St. Lawrence refused to acknowledge it. Thereafter, Ross received the telephone call from Richard Bolton explaining his need to sell 26,900 units of RUTI securities immediately, and that Forbes wanted them, but could not then complete the transaction.

On December 15 Ross spoke with John Walsh of Forbes who told Ross that he would purchase the 26,900 RUTI units for $18 a unit, $.50 more per unit than Bolton was offering to sell the securities to Ross. Ross also called Alan Greenberg, a Bear Stearns managing partner, to "confirm Ross' understanding concerning Bolton's clearing problems with Bear about which Ross had become aware on or about December 14, 1982 and to discuss with Greenberg a satisfactory way to respond" to the December 8 comparison. Greenberg "demanded" that St. Lawrence honor the trade, not knowing that the comparison reflected a fictitious transaction.

After these telephone conversations, Ross as earlier noted purchased the 26,900 RUTI units from Bolton for the account of his daughter Victoria and Bear Stearns cleared the transaction. Forbes subsequently refused to purchase the RUTI units from Ross. Forbes had offered to

purchase the RUTI securities based on an underlying agreement with Bolton that Bolton would purchase the securities for $18⅛. Thus, when Bolton was unable to honor its agreement, Forbes reneged. Only later did Ross learn of this underlying agreement between Forbes and Bolton. There is no allegation that Bear Stearns knew of this or of any other of Bolton's machinations.

At a December 21, 1982 meeting Bear Stearns threatened to redeposit RUTI securities remaining from unclaimed transactions into Bolton's account, which would, in effect, put Bolton out of business. Bolton therefore sent a wire to the Securities Exchange Commission advising that body of its net capital deficiency and withdrawing from NASDAQ as a RUTI market-maker. The market for RUTI securities collapsed, the price falling from 17⅞ bid–18¼ ask, on December 20, 1982 to 5¼ bid–5¾ ask on December 23, 1982.

## PROCEEDINGS BELOW

Two prior complaints by Ross were dismissed. The original complaint, filed in 1983, was dismissed in an opinion dated April 20, 1984. The first amended complaint, filed in November 1985, was dismissed under Fed.R.Civ.P. 9(b) in an opinion dated June 10, 1986 and reported at 639 F.Supp. 323. With the above recited background in mind, we turn attention to the two separate frauds claimed in the Rosses' second amended complaint which was also dismissed under Rule 9(b).

The first fraud alleged that defendant Bolton, the dominant market-maker for RUTI securities, manipulated and artificially inflated their price during 1981 and 1982. Bear Stearns' role in the matter was acting as clearing agent for Bolton in the trade by which appellants purchased their shares. The district court dismissed the Rosses' first fraud claim upon a finding that Bear Stearns had no knowledge that Bolton's trades were manipulative or otherwise illegal. The court also concluded that lack of *scienter* by Bear Stearns foreclosed any liability against it as a "controlling person" under § 20(a) of the 1934 Act, 15 U.S.C. § 78t(a) (1988), or as an aider and abettor under § 10(b) of the 1934 Act and Rule 10b–5. Appellants implicitly concede the correctness of these rulings on the first fraud claim.

The second fraud alleged is that on or about December 15, 1982 Bear Stearns had financed a $1.25 million purchase of 70,000 RUTI units for Bolton's account upon Bolton's representation that there were matched purchases for these units. Included among the purchases were the 26,900 units ordered by appellants. In light of Bolton's insolvent condition, Bear Stearns was at risk were any of the purported purchases to fail. On December 14, Richard Bolton had offered the 26,900 units to Ross, representing thereby, according to Ross, that he (Bolton) was solvent and that the offering price was reasonably related to a price prevailing in a free, open and competitive market. In a telephone conversation on December 15 with Mr. Greenberg of Bear Stearns, Ross was told that the December 8 comparison with St. Lawrence was valid and must be honored.

Based on these allegations, the Rosses claim that in so speaking Bear Stearns had concealed the fact that Bolton was insolvent. Bear Stearns knew this, the Rosses assert, because it put Bolton in an insolvent position on December 10 by eliminating the firm's net capital position. As a creditor, the Rosses continue, Bear Stearns dominated and controlled Bolton and his company, and knowingly induced Bolton to have Ross purchase the 26,900 units by threatening to put Bolton out of business if there were not purchases to match the 70,000 RUTI units Bear Stearns had purchased for Bolton's account. The Rosses conclude that had Donald Ross known of Bolton's situation he would not have purchased the RUTI securities, and that he purchased in reliance on Greenberg's December 15th implied assurances of solvency.

Appellants contend that there are three legal theories upon which they have stated viable causes of action against Bear Stearns under the 1934 Act: controlling person, aiding and abetting, and phantom seller/insider trading liability. These theories, appellants assert, do not assume a

fiduciary relationship towards them by Bear Stearns, but do assume one between appellants and Bolton based on the broker's ordinary fiduciary duty to its customers. From this appellants contend that Bear Stearns has a secondary or derivative trust liability towards Ross predicated on a "special relationship" that arose in December 1982 between Bear Stearns and Bolton. As such it raises, they believe, a factual question regarding whether Bear Stearns was or was not an innocent clearing agent transacting ordinary business.

## DISCUSSION

### I

Appellants have filed three complaints in this over six-year-old lawsuit, and have completed discovery of Richard Bolton, one of Bolton's partners, a trader employed at Bolton, John F. Walsh, a partner at defendant Forbes, and others, including Bear Stearns personnel. Bear Stearns has not answered the second amended complaint (the third complaint), which is the subject of this appeal; instead it successfully moved to dismiss under Fed.R.Civ.P. 9(b).

■ Rule 9(b) states upon a claim of fraud "the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." The time, place, and nature of the misrepresentations must be set forth so that the defendant's intent to defraud, to employ any scheme or artifice to defraud, to make any untrue statement of a material fact, or to engage in any act or course of business that would operate as a fraud under the securities laws is revealed. See, e.g., Stern v. Leucadia Nat. Corp., 844 F.2d 997, 1003–04 (2d Cir.), cert. denied, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988); IIT, an Int'l Inv. Trust v. Cornfeld, 619 F.2d 909, 923 (2d Cir.1980).

■ The specificity required by Rule 9(b) —as distinct from Rule 8(a)'s liberal requirement that plaintiff simply set forth a "short and plain statement of the claim showing that the pleader is entitled to relief"—serves several important policies.

The primary purpose of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based. See Denny v. Barber, 576 F.2d 465, 469 (2d Cir.1978). Rule 9(b) also safeguards defendant's reputation and goodwill from improvident charges of wrongdoing, see Decker v. Massey–Ferguson, Ltd., 681 F.2d 111, 114–15 (2d Cir. 1982); Segal v. Gordon, 467 F.2d 602, 607 (2d Cir.1972), and it serves to inhibit the institution of strike suits. See Ross v. A.H. Robins Co., 607 F.2d 545, 557 (2d Cir.1979), cert. denied, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). We recognize and rigorously enforce these salutary purposes of Rule 9(b). See, e.g., Denny v. Barber, 576 F.2d 465.

The general rule that pleadings are to be construed in the light most favorable to the pleader and accepted as true, Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), and not be dismissed, unless it appears that plaintiff can prove no set of facts that would entitle him to relief, Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957), is not thereby abrogated. When fraud is asserted, the general rule is simply applied in light of Rule 9(b)'s particularity requirements. We agree that the second amended complaint was properly dismissed under Rule 9(b).

### II

■ We also agree with the district court that the second amended complaint fails to state viable claims against Bear Stearns under § 10(b) and Rule 10b–5. We turn to those provisions.

Section 10(b) of the 1934 Act makes it "unlawful for any person, directly or indirectly ... [t]o use or employ, in connection with the purchase or sale of any security ... any ... deceptive device" in contravention of the SEC's rules. Rule 10b–5 promulgated by the SEC provides that in connection with the purchase or sale of any security it is unlawful

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, ...

Unquestionably, appellants' complaint pleads a securities law violation against the Bolton defendants. But to state a claim against Bear Stearns, as an aider and abettor of the Bolton defendants, Ross must allege, in addition to the securities law violation by the primary wrongdoer, that Bear Stearns knew of the wrong and substantially assisted in perpetrating it. *See Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983). As the district court noted, despite allegations of Bear Stearns' reckless disregard of the facts—and even assuming for present purposes that the requisite standard of recklessness has been adequately pleaded—absent a fiduciary duty owing from Bear Stearns to Ross there is no aiding and abetting liability. As we said in *IIT*, if there is no fiduciary duty—and appellants concede there is none here—the *scienter* requirement increases, so that appellants need to show that Bear Stearns acted with actual intent. 619 F.2d at 925. The district court found insufficient allegations of Bear Stearns' *scienter* and a failure adequately to allege Bear Stearns' actual intent to aid in Bolton's primary fraud sufficient to meet the test of substantial assistance. Hence, the district court dismissed appellants' second amended complaint with prejudice. *See* 639 F.Supp. at 326, 327. We agree with Judge Knapp's rationale and the conclusion he reached.

### III

We turn to the remaining issue, whether plaintiffs' claims against Bear Stearns should have been dismissed under the doctrine of *in pari delicto*. The district court did not rule on this defense advanced by Bear Stearns, though it dismissed and denied the Bolton defendants' motion to dismiss made on the same grounds. *See* 639 F.Supp. at 328–29. Bear Stearns urges that appellants' recovery should be barred by the doctrine; appellants reply that we should disregard this argument because the district court addressed it and found the defense invalid at that stage of the case.

The maxim is *"in pari delicto potior est conditio defendentis,"* that is, where parties are equally at fault, the defending party is in the stronger position. *Black's Law Dictionary* 898 (4th ed. 1968). Generally translated, it means the plaintiff should not therefore recover, and the parties should be left where they are. This view is predicated on the principle that to grant plaintiff relief would contravene the public good by aiding one to profit from his own wrong. Where both parties are *in delicto*, but not *in pari delicto*, a trial court should make findings regarding the respective amount of blame assigned to each, granting relief to the one whose wrong is less. 17 Am.Jur.2d *Contracts* § 221 (1964); *see also* 37 Am.Jur.2d *Fraud & Deceit* § 304 (1964).

Any discussion of the application of the *in pari delicto* defense must begin with *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), *modified by Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (overruling *Perma Life* to the extent that it acquiesced in intra-enterprise conspiracy doctrine under section 1 of the Sherman Act). There the Supreme Court refused to recognize the defense in an antitrust action, *id.* 392 U.S. at 140, 88 S.Ct. at 1985, with five justices in agreement that the doctrine should be narrowly defined when asserted in litigation under federal regulatory statutes. *See* 392 U.S. at 145, 88 S.Ct. at 1988 (White, J., concurring), *id.* at 147–48, 88 S.Ct. at 1989 (Fortas, J., concurring in result); *id.* at 148–49, 151, 88 S.Ct. at 1989, 1990 (Marshall, J., concurring

in result); *id.* at 154–55, 88 S.Ct. at 1992 (Harlan, J. joined by Stewart, J., concurring in part and dissenting in part). This holding prompted us to conclude that the High Court had little enthusiasm for the *in pari delicto* defense. *See Mallis v. Bankers Trust Co.,* 615 F.2d 68, 76 (2d Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981).

■ In 1985 the Supreme Court considered the defense's proper scope in securities litigation and determined that it could bar a plaintiff's suit in that field so long as (1) plaintiff truly bears at least substantially equal responsibility for the transactions for which he seeks to recover, and (2) barring the suit will not "significantly interfere with the effective enforcement of the securities laws and protection of the investing public." *See Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 310–11, 105 S.Ct. 2622, 2629, 86 L.Ed.2d 215 (1985). This two-pronged test was applied recently in *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). In applying the first prong, the Court stated that the "plaintiff must be an active, voluntary participant in the unlawful activity that is the subject of the suit." *Id.* at 636, 108 S.Ct. at 2073. In analyzing the second prong the Court reviewed the primary purpose of the securities laws to protect investors by requiring disclosure of material information so that they might make informed decisions regarding public offerings of securities. Only where prohibiting suit does not offend these legislative policies may the *in pari delicto* defense be asserted. *Id.* at 637–38, 108 S.Ct. at 2074.

■ Ross was induced to trade in RUTI securities due to Bolton's and Walsh's assurances that the securities would be sold almost immediately to Forbes. Ross' purchase was not an investment made pursuant to an arms-length transaction, but an attempt to profit from a "sure thing." Appellants have conceded that Bear Stearns had no knowledge of Bolton's illegal scheme. Thus, because Ross intentionally entered into the prearranged trade with Walsh, with its supposed guaranteed profit, he rather than Bear Stearns must bear the responsibility for the risks of this transaction. The first prong of *Bateman Eichler* is therefore satisfied. Before permitting the *in pari delicto* defense to be used to prohibit plaintiffs' suit against Bear Stearns, the second prong must also be met: will prohibiting suit offend Congress' policy that requires full disclosure of material information to investors? This prong of the rule is more difficult to analyze because it involves an assessment of policy, not simply of facts.

Whether the second prong of *Bateman Eichler* has been fulfilled hinges on Bear Stearns' actual role in the sale of the 26,-900 shares of RUTI securities to Ross. Its office in this transaction was akin to that of a clearing agent. The function of such an agent is to "act[ ] as an intermediary in making payments or deliveries or both in connection with transactions in securities or [to provide] facilities for comparison of data respecting the terms of settlement of securities transactions, . . . or for the allocation of securities settlement responsibilities." 15 U.S.C. § 78c(a)(23)(A) (1988).

The clearing agency relationship is one arrived at by contract between the introducing firm (here Bolton) and the clearing or carrying firm (here Bear Stearns). Each agreement, according to Rule 382 of the New York Stock Exchange, "shall specifically identify and allocate the respective functions and responsibilities of the introducing and carrying organizations...." Rule 382, *reprinted in* NYSE Guide (CCH) ¶ 2382. At a minimum the agreement must address (1) opening of accounts, (2) credit, (3) maintenance of records, (4) receipt and delivery of funds and securities, (5) safeguarding the same, (6) confirmation and statements, and (7) acceptance of orders and execution of transactions. *See id.* In the instant case it is undisputed that Bolton initiated and executed its own trades. Bear Stearns was allocated the functions of maintaining records, receiving and deliver-

ing funds, and sending comparisons or confirmations. Thus, Bear Stearns' functions were limited merely to monitoring Bolton's trades and to ensuring that those records were accurately maintained.

Bear Stearns did not open the account with Ross or for that matter have any relationship with investors other than collecting funds for sales of RUTI securities which its records indicated were due on sales that had already occurred. It had no obligation to disclose information regarding these securities to potential investors. Moreover, it is established on this record that Bear Stearns performed its clearing functions without guilty knowledge of Bolton's wrongdoing. We recognize that the remedial purpose of the Exchange Act is to protect innocent investors. Here Bear Stearns did not act to deprive any investor of material information needed to make an informed decision. Its actions in this case were simply those of an innocent clearing agent conducting its ordinary business.

## CONCLUSION

Consequently, we conclude it would not thwart the strong legislative policy to protect investors and to secure the effective enforcement of the securities laws to permit Bear Stearns to raise the *in pari delicto* defense in this case, and that because both prongs of *Bateman Eichler* have been met, that defense stands as a complete bar to appellants' suit.

Accordingly, for the reasons stated the judgment appealed from is affirmed.