**UNITED STATES of America, ex rel. SEMTNER, Plaintiff,**

v.

**MEDICAL CONSULTANTS, INC., d/b/a Emergency Physicians Billing Services, Inc.; J.D. McKean; EmCare, Inc.; Spectrum Emergency Care; Synergon; Medicus Medical Group; Coastal Emergency Physicians Group of Texas; and Coordinated Health Services, Inc., Defendants.**

**No. Civ–94–617–C.**

United States District Court,
W.D. Oklahoma.

Feb. 24, 1997.

Cheryl A. Vaught, Hammons & Hunter, Oklahoma City, OK, Laurie A. Oberembt, U.S. Department of Justice, Commercial Lit-

igation, Civil Division, Washington, DC, Jon W. Laasch, Jacobsen & Laasch, Edmond, OK, Robert L. Vogel, Washington, DC, for Theresa Semtner.

Wesley C. Fredenburg, Todd P. Taylor, Timila S. Rother, Crowe & Dunlevy, Oklahoma City, OK, Terry W. Tippens, Bryan N.B. King, Fellers Snider Blankenship Bailey & Tippens, Oklahoma City, OK, for Emergency Physicians Billing Services, Inc. and J.D. McKean.

William S. Price, Phillips McFall McCaffrey McVay & Murrah, Oklahoma City, OK, Martin B. McNamara, Gibson Dunn & Crutcher, Dallas, TX, for EmCare, Inc.

Elaine R. Turner, Tod J. Barrett, Hall Estill Hardwick Gable Golden & Nelson, Oklahoma City, OK, for Spectrum Emergency Care, Synergon, and Coordinated Health Services, Inc.

Terry W. Tippens, Bryan N.B. King, Robert W. Biddle, S. Craig Holden, Laurence B. Russell, Ober Kaler Grimes & Shriver, Baltimore, MD, for Medicus Medical Group.

## MEMORANDUM OPINION AND ORDER

CAUTHRON, District Judge.

This matter comes before the Court on the motions of defendants Medical Consultants d/b/a Emergency Physician's Billing Services, Inc. (EPBS), J.D. McKean (McKean), and EmCare and defendants Spectrum Emergency Care (Spectrum), Synergon and Coordinated Health Services, Inc. (Coordinated) to dismiss the claims of the *qui tam* relator alleging those claims do not survive her death. In response, the personal representative of the relator's estate has filed a motion for substitution of the personal representative as *qui tam* plaintiff in accordance with Fed.R.Civ.P. 25(a)(1). Defendants Spectrum, Synergon and Coordinated also seek dismissal of the government's claims without prejudice for failure to timely serve its complaint on the defendants. Additional motions were filed by defendants Medicus and Coastal to dismiss the government's First Amended Complaint as it fails to comply with Fed.R.Civ.P. 9(b). For the reasons more fully addressed below, the motions of the defendants are denied, and the motion of

the personal representative for substitution is granted.

## I. *Background*

On April 29, 1994, Theresa Semtner initiated this action by filing a complaint as *qui tam* plaintiff against defendants alleging violations of the False Claims Act (FCA or the Act) and conspiracy to violate the Act. After numerous delays, the government elected to intervene in the action on March 3, 1995, as allowed by 31 U.S.C. § 3730(b)(2), (4). Although the death of the relator on May 22, 1996, spurred a number of the defendants to file motions to dismiss similar to those presently before the Court, the government chose to file a First Amended Complaint on June 11, 1996, adding additional claims for unjust enrichment and payment under mistake of fact, mooting this first round of motions. The defendants resubmitted their motions with some modifications following the filing of the amended complaint.

On August 15, 1996, a "Suggestion of Death on the Record" was filed by relator's counsel confirming that Ms. Semtner died of complications from renal cell cancer on May 22, 1996. Shortly thereafter the representative filed a motion for substitution as relator which also served as the relator's response to the motions to dismiss. The motion and accompanying affidavits represent that the relator's sister, Kevin K.T. Trim, has been appointed by the District Court of Oklahoma County as the personal representative (representative) of the relator's estate. These motions finally came at issue on December 5, 1996, when the representative filed her reply brief.

## II. *Discussion*

The central issue raised by these motions is whether the *qui tam* relator's action survives her death. Defendants also urge dismissal based upon the failure of the First Amended Complaint to plead fraud with particularity as to some of the defendants, and because the government's service of the complaint was not timely.

## A. Survival

 Federal Rule of Civil Procedure 25(a) provides that "[i]f a party dies and the claim is not thereby extinguished, the Court may order substitution of the proper parties." The cause of action, therefore, must be one that survives the death of the party before the Court may order substitution. The parties have agreed upon a number of basic legal principles governing the survivorship of actions in federal court. For instance, although there is a small and unconvincing minority to the contrary,[1] the parties concur that whether an action survives the death of the relator is a question of federal common law unless a statute directly addresses the issue. *See Ex parte Schreiber*, 110 U.S. 76, 3 S.Ct. 423, 28 L.Ed. 65 (1884); *United States v. NEC Corp.*, 11 F.3d 136, 137 (11th Cir.1994); *Smith v. Dep't of Human Serv.*, 876 F.2d 832, 834 (10th Cir.1989); *Murphy v. Household Fin. Corp.*, 560 F.2d 206, 208 (6th Cir.1977). Federal courts generally recognize that claims characterized as "penal" abate, while claims characterized as "remedial" survive.[2] *See Schreiber*, 110 U.S. at 79–80, 3 S.Ct. at 423–24; *Smith*, 876 F.2d at 834–35. After reviewing the status of the *qui tam* relator under the traditional survivorship tests, the Court concludes the relator and her claims do not fit within the definition of either penal or remedial, and therefore, the only rational characterization of the relator's claim must be derived from the underlying claim of the government. As the parties do not contest the remedial nature of the government's claim, the action does survive and the personal representative should be substituted in the stead of the decedent relator.

Defendants argue that the claims of the government and the relator should be examined independently, and such examination will show the relator's claims are not remedial in nature. They contend that because a statute may be remedial as to one party or claim and penal as to another party or claim in the same action, it follows that the relator's claims are distinct and should be analyzed separately. Although the Court agrees that a statute may be penal as to some parties or claims and remedial as to others, this does not compel the conclusion that such is always the case when multiple claims arise. The only citation offered by the defendants in support of this proposition is an opinion of the Court of Appeals for the Eleventh Circuit which merely states broadly that "a statute can be remedial as to one party, yet penal as to another." *NEC*, 11 F.3d at 137 n. 1. That case is the only published opinion addressing the survivability of actions following the death of the *qui tam* relator. However, the Eleventh Circuit in *NEC* never addressed how or why the relator's claims are distinct from that of the government, and therefore

---

1. *See Johnson v. Household Fin. Corp.*, 453 F.Supp. 1327, 1329 (S.D.Ill.1978) (citing *Brazier v. Cherry*, 293 F.2d 401 (5th Cir.) *cert. denied*, 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961)). A persuasive criticism of older federal cases applying state survival law may be found in Note, *Survival of Actions Brought Under Federal Statutes*, 63 Col.L.Rev. 290, 294–98 (1963).

2. Although the parties are in general agreement about this issue, as the Court will address more fully below, this characterization may not be an entirely accurate statement. The Supreme Court's decision in *Schreiber*, the case to which most federal courts attribute the penal/remedial test, only discussed whether the statute considered by the Supreme Court was penal; it did not engage in an analysis to determine if the statute was remedial.

Moreover, it is questionable whether the common law as adopted and crafted in the federal appeals courts is defensible. Without comment, the courts apply the penal/remedial test to all questions of survival regardless of the decedent's status as plaintiff or defendant. The Court notes that the jurisprudential basis for applying a penal/remedial test to survivorship questions following the death of a defendant, as in *Schreiber*, may not carry over to instances in which the plaintiff is the decedent. Clearly, once the defendant has died it is no longer possible to fully accomplish a statute's retributive or deterrent goals. Yet, a plaintiff continues to be deserving of remedial compensation from a defendant or her estate regardless of the defendant's continued viability, while the survival of the plaintiff is irrelevant to whether the defendant continues to be worthy of punishment. Therefore, a rule of abatement that accounts for the position of the decedent in the litigation is far more defensible than the present party-neutral rule. Nevertheless, as the parties have not briefed this core issue, and the Court finds that any change in such a long-standing common law rule is better decided in the circuits' chambers, the Court will not attempt to remedy the rule's deficiencies in the present order.

why a separate analysis should be conducted. A review of the relator's role under the same traditional common law test adopted by the court of appeals in *NEC* and most federal circuits clearly shows that for purposes of survival, the claims are not distinct and the relator's claims are merely derivative of those of the government.

■ To determine whether a statute is remedial or penal, the Court should look to the language of the statute and to its legislative history. *Smith*, 876 F.2d at 835. This review is conducted by most federal courts following the test created by *Murphy v. Household Fin. Corp.*, 560 F.2d 206 (6th Cir.1977). Although the test has never been unquestionably adopted in this circuit, in *Smith*, the Tenth Circuit cited the test with approval, but chose not to apply it when the Supreme Court had already made a dispositive statement on the penal or remedial question. 876 F.2d at 835. The *Murphy* test identifies three issues a court should consider: " '1) whether the purpose of the statute was to redress individual wrongs or more general wrongs to the public; 2) whether recovery under the statute runs to the harmed individual or to the public; and 3) whether the recovery authorized by the statute is wholly disproportionate to the harm suffered.' " *Id.* (quoting *Murphy*, 560 F.2d at 209).

■ After reviewing the application of these factors to the present situation and having in mind the opinion of the court of appeals in *NEC*, the Court finds that the most that can be proven is that the relator's stake in the action cannot be characterized rationally as either penal or remedial. For instance, regarding the first *Murphy* factor, at least one argument made by defendants urges the conclusion that because the damages run primarily to the government, the purpose of the FCA was to redress public as opposed to individual wrongs. The Court rejects this argument outright. It is axiomatic that the government can act, just as an individual, to recover damages it has in-

curred without that action becoming penal or punitive solely by virtue of the government's presence. *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943). Moreover, this argument primarily concerns the status of the government, which the parties have conceded is remedial.

The other primary argument advanced by the defendants regarding the first two *Murphy* factors is that any compensation to the relator does not run to her individually, because her claim is based upon damages to the government. Certainly, the statute is not intended to remedy harms to the relator, but this comes no closer to proving that the relator's right to recover is a penal action against the defendants. The Eleventh Circuit in *NEC* ruled otherwise, finding that any award coming to the relator is intended to be compensation for the stress, potential loss of work, and other extreme repercussions that may arise from reporting fraud against one's employer or in one's industry. 11 F.3d at 138. In addition, the court of appeals held that the relator was being compensated for "the substantial time and expense involved in bringing a *qui tam* action." Although Congress was interested in the damages suffered by relators, as far as the *qui tam* provisions were considered, this concern came only in the context of the enforcement problems created by the "conspiracy of silence" Congress believed was protecting the illicit acts of companies, and the inducements that need be offered to break that conspiracy. S.Rep. No. 99–345, 99th Cong., at 2, 14, 23–24 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5267, 5279, 5288–89. Moreover, 31 U.S.C. § 3730(h) specifically provides a remedy to protect whistle blowers from retaliation that is separate and apart from any recovery a relator may gain under 31 U.S.C. § 3730(d), the *qui tam* provisions. The potential reward of the relator under the *qui tam* provisions is in no way contingent upon the damage she may have incurred by stress or loss of employment.[3] Neither the representative

---

**3.** When the government chooses to conduct the litigation, the *qui tam* relator may only claim 15 to 20 percent of the action or settlement, "depending upon the extent to which the person

substantially contributed to the prosecution of the action." 31 U.S.C. § 3730(d)(1). Likewise if the action is based primarily upon previously publicly disclosed information, the maximum

nor the court of appeals in *NEC* identify anything in the legislative record that manifests an intent that the relator have a cause of action based upon her injuries other than the section 3730(h) whistle blower provisions.

Likewise, as far as the court of appeals in *NEC* concluded that the relator provisions were intended as a remedy or separate cause of action for the relator's injuries and time and expense of litigation, it is important to note that, although she may receive an enhanced percentage based upon the utility and intensity of her participation, the amount of the government's total recovery (the amount from which she will ultimately receive a percentage) cannot be increased due to her injuries or participation in the litigation beyond the government's statutory and actual damages. Even if her injuries are substantial and proven, she may not recover unless the government does.

These same considerations are also dispositive of the third *Murphy* factor. The parties have agreed that the government's cause of action is remedial. Therefore, because the amount of the total recovery the defendants may have to pay is governed not by the relator's actions, but the damages to the government, the Court finds that any attack on the proportionality of the damages amount must be made on the underlying action. By conceding the remedial nature of the government's claim, the defendants have chosen to forego any such attack. Although the defendants argue that the amount the relator takes is arbitrary and disproportionate to the harm suffered, this merely illustrates how unnatural and forced the application of the *Murphy* test is to the relator's role. Once again, Congress was not concerned with the damages suffered by the relator, but the damages inflicted upon the government. It is undeniable on even the most cursory review of the legislative record that the *qui tam* provisions were added to the FCA as an incentive to have individuals come forward with information and prosecute claims which might not be initially efficient

for the government to pursue. S.Rep. No. 99–345 at 1–2, 1986 U.S.C.C.A.N. at 5266. For the same reasons that the statute is not remedial when considering the third *Murphy* factor, it is equally clear that the defendant is not punished or its exposure to liability increased by the presence of the relator, other than the fees and costs which this Court is not prepared to label as penal.

The defendants as well as the court of appeals in *NEC* appear to assume that there is a universe of actions that is filled entirely and exclusively with two subsets of claims— remedial and penal. The defendants implicitly argue that so long as they can prove it is not remedial, the claim must be penal by process of elimination. The Court refuses to accept this assumption for the role of the *qui tam* relator. The *Murphy* analysis presented by the parties and their efforts to categorize the relator result in an artificial attempt to place a square peg into a round hole. Both parties clearly identify in their arguments what is so evident in the legislative history and structure of the *qui tam* provisions of the FCA: the relator is a mechanism of enforcement. The relator's recovery is not compensation for damages nor is it a penalty to be imposed upon the defendants; it is a lure. Her ultimate claim is not even against the defendants, but against the government for a share of the award. *Qui tam* is not a cause of action, it is a means of pursuing the government's cause of action. The parties have fallen into an understandable myopia trying merely to apply the majority rule to the facts of the case. However, the results are akin to asking whether a chicken is a mammal or a fish.

Moreover, the Court finds that the common law of survival of actions is more concerned with assuring that penal actions do not survive than identifying whether an action is remedial or penal. For instance, the ultimate source of the modern federal common law of survival is found in *Schreiber* wherein the Supreme Court merely states

---

award is 10 percent of the government's damages award. *Id.* However, if a relator is allowed to conduct the action entirely on her own, she will recover between 25 and 30 percent of the award. *Id.*, § 3730(d)(2). In fact, regardless

of the damage to the relator or even her participation in the litigation, a court may reduce or eliminate her share if it concludes that the relator was involved in the fraud. *Id.*, § 3730(d)(3).

that "[a]t common law, actions on penal statutes do not survive." 110 U.S. at 80, 3 S.Ct. at 424. The Supreme Court did not identify a penal or remedial analysis. Although the Court believes that the defendants have proven that the action is not remedial, the Court also agrees with the representative that the action is not penal and that the defendants have failed to show that it is. In fact, the relator's role is not a cause of action, but, as illustrated above, any recovery by the relator is purely derivative of the government's underlying cause of action.

This result is consistent with fulfilling the goals Congress envisioned when it passed the 1986 amendments to the *qui tam* provisions. First, if the role of the relator is held to be penal, rather than merely derivative or remedial, courts would be forced to abate actions in which the government had chosen not to join. In the Senate Report, the Committee states that

> perhaps the most serious problem plaguing effective enforcement is a lack of resources on the part of the Federal enforcement agencies.... Taking into consideration the vast amounts of Federal dollars devoted to various complex and highly regulated assistance and procurement programs, Federal auditors, investigators, and attorneys are forced to make "screening" decisions based on resource factors. Allegations that perhaps could develop into very significant cases are often left unaddressed at the outset due to a judgment that devoting scarce resources to a questionable case may not be efficient.

S.Rep. No. 99–345 at 7, 1986 U.S.C.C.A.N. at 5272. Congress clearly wanted to remedy this deficiency in the federal enforcement scheme by giving individuals incentives to pursue claims, regardless of the government's involvement, so they might ferret out and litigate claims that the government would not. If the Court chose here to follow the advice of defendants, claims prosecuted solely by the relator would also disappear at the relator's death even if the personal representative of the estate is willing to carry on the tasks Congress so obviously tried to encourage on the private level. Defendants contend that the Court should not consider the effect its decision may have on cases in which the relator proceeds alone because the government is present in this case. Nevertheless, they in no way distinguish how the present situation is more penal for survival purposes than when the relator is prosecuting the case on her own so to justify a result clearly contrary to congressional intent.

Congress was concerned not only that individuals ferret out and prosecute fraudulent claims on the government by themselves, but that individuals act as overseers of actions in which the government has joined. The Senate Report states that the statute is intended to

> allow[ ] the private individual who brought the false claims suit to take a more active role in the litigation if he chooses ... Subsection (c)(1) provides *qui tam* plaintiffs with a more direct role not only in keeping abreast of the Government's efforts and protecting his financial stake, but also acting as a check that the Government does not neglect evidence, cause undue delay, or drop the false claims case without legitimate reason ... Additionally, the person who brought the action may formally object to any motions to dismiss or proposed settlements between the Government and the defendant.

S.Rep. No. 99–345 at 25–26, 1986 U.S.C.C.A.N. 5290–91. The legislative history clearly reveals that Congress believed the participation of private plaintiffs at all phases of the litigation would lead to a greater number of recoveries for the government and possibly in higher amounts—the ultimate goals of the 1986 amendments. Accordingly, it is entirely consistent with the statutory structure and history of the *qui tam* provisions of the FCA for the Court to conclude that the relator's role is neither penal nor remedial, but derivative of the remedial claims of the government and thereby survives the death of the relator. Therefore, the personal representative's motion for substitution is granted, and defendants' motions to dismiss are denied as far as they urge dismissal of the relator's claims based upon her death.

**B. Timeliness**

■ The motion to dismiss of defendants Spectrum, Synergon, and Coordinated also

asserts that the government's First Amended Complaint should be dismissed without prejudice as it was filed out of time. Although the Court agrees that nothing relating to the government's participation in this case has been expeditious, the Court did grant the United States leave to amend the complaint. That order imposed no deadlines and was in no way governed by the January 16, 1996, order of this Court setting a deadline for the government to serve the original complaint. In addition, as this case has been pending on the Court's docket for almost three years, the Court finds that dismissal without prejudice would only further delay the case in contravention of any notions of judicial economy for which this litigation may still hold hope. Therefore, defendants' motion to dismiss on timeliness grounds is denied.

## C. Sufficiency of Pleadings

■ Defendants Medicus and Coastal also urge the Court to dismiss the government's First Amended Complaint for failure to plead fraud with particularity in accordance with Fed.R.Civ.P. 9(b). In the alternative, they seek an order directing the government to make a more definite statement of its claims pursuant to Fed.R.Civ.P. 12(e). These defendants contend that the complaint fails to identify how they participated in the fraud and the exact nature of the fraud as it relates to their activities. Federal Rule of Civil Procedure 9(b) states: "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Although there is no controlling authority in this circuit addressing whether Rule 9(b) applies in the FCA context, courts that have considered the question have held that it does apply, and the Court finds this authority persuasive. *Gold v. Morrison–Knudsen Co.*, 68 F.3d 1475 (2d Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 1836, 134 L.Ed.2d 939 (1996) (citing *Cooper v. Blue Cross & Blue Shield, Inc.*, 19 F.3d 562, 568 (11th Cir.1994) *(per curiam )*; *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield, Inc.*, 755 F.Supp. 1055, 1058 (S.D.Ga. 1990)); *see also, United States ex rel. Aranda v. Community Psychiatric Centers,* 945 F.Supp. 1485 (W.D.Okla.1996). Addressing Rule 9(b) in the context of securities fraud cases, the Tenth Circuit has adopted the Second Circuit's characterization of the rule's purpose as follows:

'The primary purpose of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based ... Rule 9(b) also safeguards defendant's reputation and goodwill from improvident charges of wrongdoing.'

*Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982 (10th Cir.1992) (quoting *Ross v. Bolton,* 904 F.2d 819 (2d Cir.1990)). The potential harshness of Rule 9(b) is tempered because in reviewing the complaint "a court [is] to read Rule 9(b)'s requirements in harmony with Rule 8's call for a 'short and plain statement of the claim' which presents 'simple, concise, and direct' allegations". *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1362 (10th Cir.1989). Generally, when Rule 9(b) applies, plaintiff must identify the fraudulent statement or representation, the person making the statement, and when the statement was made. *Seattle–First Nat'l Bank v. Carlstedt,* 800 F.2d 1008, 1011 (10th Cir.1986). However, when plaintiff's allegations involve multiple defendants engaging in the same fraudulent conduct over an extended period of time, and that conduct and the defendants' alleged role in that conduct is clearly identified in the pleadings, the Court will not dismiss the complaint if defendants have received fair notice of the claims against them. *See United States v. Children's Shelter, Inc.*, 604 F.Supp. 865 (W.D.Okla.1985).

In the present case, plaintiff in its First Amended Complaint has asserted that all of the defendants were involved in a scheme to falsify the nature of emergency room bills submitted to the government for payment through EPBS and McKean. The complaint identifies this scheme in exacting detail in paragraphs 17 through 65 but in these paragraphs does not mention by name the defendants that had allegedly entered into the prohibited percentage billing contracts with EPBS and McKean. Instead, plaintiff identifies defendants Coastal and Medicus by

name and their contractual relationship with EPBS once in the beginning of the complaint, and thereafter identifies them by their status as contracting defendants in the allegedly fraudulent billing scheme. (Am.Compl. ¶¶ 14, 15). The Court agrees with the government as it argues that a fraudulent scheme that has occurred over a long period of time with perhaps thousands of billing documents need not be pled with reference to the exact nature of each allegedly fraudulent document. The government has more than thoroughly identified how the scheme operated and even the specific billing codes that were employed by EPBS and McKean that allegedly resulted in illicit percentage billing contracts with the other defendants. The Court finds that the complaint's incorporation by reference of the defendants' actions throughout the complaint without identifying them by name is sufficient to place the defendants on fair notice of the claims they must defend. *See Children's Shelter,* 604 F.Supp. at 867. Accordingly, the motion to dismiss of defendants Medicus and Coastal is denied.

### III. Conclusion

The Court has fully considered the state of the federal common law in relation to the survivability of a *qui tam* relator's claims, and concludes that any reasonable characterization of the relator's claim must be derivative of the government's remedial action. Thus, the relator's claims survive her death. In addition, the government's First Amended Complaint was timely filed and conforms to the requirements of Fed.R.Civ.P. 9(b).

Accordingly, the Court finds that the following motions are denied: the motion to dismiss of defendants Medical Consultants d/b/a Emergency Physicians Billing Services, Inc. and J.D. McKean (docket nos. 75, 76); the motion to dismiss of defendants Spectrum Emergency Care, Synergon and Coordinated Health Services (docket nos. 72, 73); the motion to dismiss of defendants Medicus and Coastal (docket no. 85); and the response of defendant EmCare as it is intended to be a joinder in the motion to dismiss of defendants Medical Consultants d/b/a Emergency Physicians Billing Services, Inc. and J.D. McKean (docket no. 124). Likewise, the

Court grants the representative's motion for substitution (docket nos. 110, 111), and orders that the representative of the relator's estate, Kevin K.T. Trim, be substituted as plaintiff and relator in this action for decedent relator Theresa Semtner.

IT IS SO ORDERED.