**Kathleen M. VAN ALSTYNE, Plaintiff–Appellant,**

**v.**

**The ACKERLEY GROUP, INC., f/k/a Ackerley Communications, Inc., WIXT TV, Inc., A. Stephen Kronquest and Stephen Kimatian, Defendants–Appellees.**

No. 00–9340.

United States Court of Appeals, Second Circuit.

May 21, 2001.

Michael J. Sciotti, Hancock & Estabrook, Syracuse, NY, for appellant.

Michael Reiss, Davis Wright Tremaine, Seattle, WA, for appellees Ackerley Group, WIXT TV, and Kimatian.

Joseph C. Dole, Bond, Schoeneck & King, Syracuse, NY, for appellee Kronquest.

Present KEARSE and SACK, Circuit Judges, and RAKOFF, District Judge.[*]

[*] Honorable Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

*SUMMARY ORDER*

This cause came on to be heard on the record from the United States District Court for the Northern District of New York, and was argued by counsel.

ON CONSIDERATION WHEREOF, it is now hereby ordered, adjudged, and decreed that the judgment of said District Court be and it hereby is affirmed.

Plaintiff Kathleen M. Van Alstyne appeals from so much of a judgment of the United States District Court for the Northern District of New York, Frederick J. Scullin, Jr., *Chief Judge,* as (1) summarily dismissed her complaint alleging that defendants The Ackerley Group, Inc., and its subsidiary WIXT TV, Inc., in Syracuse, New York (collectively the "Company"), subjected her to sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), with respect to the amorous advances of WIXT's former station manager, defendant A. Stephen Kronquest; and (2) declined to exercise supplemental jurisdiction over her related claims under state law. On appeal, Van Alstyne, a former general manager of sales at WIXT, contends principally that the record demonstrates that she was subjected to a hostile work environment, *quid pro quo* sexual harassment, and retaliation. In light of Van Alstyne's testimony at her pretrial deposition ("Van Alstyne Dep."), and those paragraphs of the Company's Statement of Undisputed Facts In Support of Defendants Ackerley and WIXT's Motion for Summary Judgment that Van Alstyne expressly admitted (the "Undisputed Facts"), we affirm for the reasons that follow.

*The Claims of Retaliation and* Quid Pro Quo *Harassment*

 "[T]o establish a *prima facie* case of *quid pro quo* harassment, a plaintiff must present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment." *Karibian v. Columbia University,* 14 F.3d 773, 777 (2d Cir.), *cert. denied,* 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994). To make out a prima facie case of retaliation, the plaintiff must show "[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action." *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998) (internal quotation marks omitted). In the present case, the district court stated that, beyond the allegations in her complaint, Van Alstyne offered no evidence that could support a finding that the terms and conditions of her employment were altered because of her reactions to Kronquest's amorous advances. We agree. Although Van Alstyne stated that late on the afternoon of October 17 or 18, 1994, when she stopped by Kronquest's office to say that she was leaving for the day, Kronquest fired her, saying " 'Vacate your job' " (Van Alstyne Dep. at 128), she testified that he really said nothing to her either before or after that; and Van Alstyne returned to work the following day (*id.* at 129) and knew that she had not been fired (*id.* at 136).

 Although Van Alstyne asserted that the Company thereafter discriminated against her on the basis of gender, she produced no evidence to support that assertion. As to Kronquest himself, she complained that in October 1994 he told other managers that there was a problem with her and held focus groups with some of her assistants without informing her (Undisputed Facts ¶ 79), and that other department heads thereafter treated her more coolly (Van Alstyne Dep. at 558). But she testified that she had no knowledge or information that any of this was because of her gender, and she did not believe her treatment by other department heads was based on her gender. (*Id.* at 559.) Her other complaints centered on the period between March and May of 1995, by which time Kronquest had resigned, at the Company's request, and David Reid was acting as the interim station manager. Reid implemented a limited reorganization that required the traffic manager to report directly to the general manager rather than to the general sales manager. Van Alstyne testified that she felt the Company discriminated against her on the basis of gender when it (a) caused this rerouting of traffic department reporting, (b) moved two assistants from the sales department to the traffic department, and (c) required the sales associates to write their own proposals and answer their own telephones. (Undisputed Facts ¶ 79.) However, Van Alstyne testified that she had no knowledge or information that any of this was related to her gender (Van Alstyne Dep. at 555, 558–59), and she acknowledged that the two assistants reassigned to the traffic department thereby reported to another woman (*id.* at 555). Van Alstyne "could think of no other actions that were discriminatory." (Undisputed Facts ¶ 80.) She admitted that after she complained about Kronquest, she was neither demoted, nor suspended, nor reprimanded, and that neither her title nor her rate of pay was changed (Van Alstyne Dep. at 560).

Van Alstyne ceased to work at the Company in June 1995 and was removed from

the payroll in September 1995; but she adduced no evidence from which a rational juror could infer that the termination was the result of gender discrimination or retaliation. Indeed, Van Alstyne's admissions compel a contrary conclusion. For example, the Company's chief financial officer "Denis Curley came to the station in January 1995. He asked Ms. Van Alstyne to come up with a compensation plan for the sales executives. No matter how many times he asked, she refused to do so." (Undisputed Facts ¶ 76.) Defendant Stephen Kimatian was hired as general manager of the station in May 1995 (Undisputed Facts ¶ 85), and when he

> arrived at the station in May 1995, he asked Ms. Van Alstyne to come up with account lists. She had known of the need for the account lists since March. By June she had not done it. Ms. Van Alstyne admits that this was a fair request of her by Mr. Kimatian.

(Undisputed Facts ¶ 88.) Kimatian also

> had wanted a new salesperson hired by July 1, 1995. He told Ms. Van Alstyne that it was urgent that it get done. She failed to hire a new salesperson by July 1. Ms. Van Alstyne agrees that this was unacceptable behavior. Mr. Kimatian expressed his concern about this both verbally and in a written memorandum. Ms. Van Alstyne admits it was fair for Mr. Kimatian to be concerned about her lack of effort.

(Undisputed Facts ¶ 92; Memorandum from Steve Kimatian to Kathleen Van Alstyne dated June 26, 1995.)

> The memorandum also addresses the fact that Ms. Van Alstyne still had not completed the account lists that Mr. Kimatian had asked her to do. She admits that it was fair for him to be concerned about this, too.

(Undisputed Facts ¶ 93.)

> Mr. Kimatian also told Ms. Van Alstyne in the memorandum that he was con-

cerned about the way she related to other department heads. Ms. Van Alstyne admits this was also a fair concern.

(Undisputed Facts ¶ 94.) "After receiving th[e June 26, 1995] memorandum Ms. Van Alstyne suffered a mental breakdown, and never returned to work." (Undisputed Facts ¶ 96.)

In sum, Van Alstyne conceded that, despite requests from her supervisors over a span of one-to-five months, she, as general sales manager, had failed to compile account lists, had failed to hire a needed salesperson, and had failed to produce a compensation plan for her sales force, and that her relationship with other department heads was a cause for concern. She ceased to work at the station after the new station manager expressed his concerns about her work. We conclude that the record supports the grant of summary judgment dismissing Van Alstyne's claims of *quid pro quo* sexual harassment and retaliation, given the lack of evidence from which a rational juror could infer that the Company took action adverse to Van Alstyne, and the lack of evidence that her ultimate departure from the Company resulted from either her resistance to Kronquest's advances or her complaints about them.

*The Claim of Hostile Work Environment*

In order to defeat a motion for summary judgment dismissing a claim of sexual harassment in the nature of a hostile work environment, a plaintiff must present evidence sufficient to permit a rational trier of fact to find two elements. First, she must adduce evidence that the harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment and create a[ ] ... working

environment" that, given the totality of the circumstances, a reasonable person would find hostile or abusive, *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks omitted), and second, she must show a specific basis for imputing the hostile work environment to the employer. *See generally Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Industries v. Ellerth,* 524 U.S. 742, 754, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (*"Burlington "*); *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 72–73, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (*"Meritor "*); *Richardson v. New York State Department of Correctional Service,* 180 F.3d 426, 436 (2d Cir.1999); *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1042 (2d Cir.1993). Whether the harassing conduct of a supervisor should be imputed to the employer depends on the circumstances of the particular case and is to be determined largely in accordance with common-law principles of agency. *See Faragher,* 524 U.S. at 791–92, 118 S.Ct. 2275; *Burlington,* 524 U.S. at 754–55, 118 S.Ct. 2257; *Meritor,* 477 U.S. at 72–73, 106 S.Ct. 2399; *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 152 (2d Cir.1997); *Karibian v. Columbia University,* 14 F.3d at 779. Although an employer is presumptively responsible where the perpetrator of the harassment was the victim's supervisor, the employer is entitled to prevail if (1) the supervisor's harassment did not culminate in a "tangible employment action," and (2) the employer can show that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (a) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise," *Burlington,* 524 U.S. at 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 807, 118 S.Ct.

2275, or (b) the employee complained and the employer took "prompt and appropriate corrective action in response to [the] complaint," *Perry v. Ethan Allen, Inc.,* 115 F.3d at 154; *see also Richardson v. New York State Department of Correctional Service,* 180 F.3d at 441–43.

■ In the present case, the district court granted summary judgment dismissing Van Alstyne's hostile work environment claim because it concluded that her evidence failed to portray an environment that was sufficiently abusive to meet the above standards. We regard this as a close question. Van Alstyne's complaints focused on the nine-month period from February through October 1994. She presented evidence of touching by Kronquest, though it consisted solely of his twice holding her hand (once in a taxi, once in a restaurant), once kissing her on the cheek as she was getting off an elevator, and once brushing her hair from her forehead in a restaurant. (Undisputed Facts ¶ 29; Van Alstyne Dep. at 426–27.) However, Van Alstyne herself had kissed other members of her sales department (Undisputed Facts ¶ 21; Van Alstyne Dep. at 731 (around the holidays "we all ... g[ave] each other a kiss on the cheek")); and she had given Kronquest such a kiss more than once, including during 1994 (Undisputed Facts ¶ 38), "[p]robably [at] Christmas" (Van Alstyne Dep. at 731–32). Van Alstyne testified, however, that after Kronquest asked her in early 1994 to become romantically involved, she told him she wanted their relationship to be one strictly of business, and that he nonetheless thereafter engaged her in many personal conversations; frequently made comments on her clothing, including some parts not visible; several times asked her to go on vacations with him; sent and offered her expensive gifts; and repeatedly asked her to marry him. (Undisputed

Facts ¶¶ 23–26, 33, 35–36; Van Alstyne Dep. at 53, 68–69.) While we express no view, we decline to base our affirmance on the district court's conclusion that no rational juror could infer from the totality of the circumstances that a reasonable employee would have found the environment hostile or abusive.

We conclude that the record is clear, however, that the Company was entitled to summary judgment on the ground that even if Kronquest's romantic advances produced a hostile work environment, his actions could not be imputed to the Company because there is no genuine dispute that the Company took immediate and effective corrective action when Van Alstyne complained. An employer is of course not entitled to summary judgment on the basis of its response to a complaint of prohibited discrimination " '[i]f the evidence creates an issue of fact as to whether [its] action [wa]s effectively remedial and prompt.' " *Richardson v. New York State Department of Correctional Service*, 180 F.3d at 441 (quoting *Gallagher v. Delaney*, 139 F.3d 338, 348 (2d Cir.1998)). But, as the following description of the record shows, there is no such issue in the present case, given Van Alstyne's deposition testimony and the Undisputed Facts.

The conduct by Kronquest that is the subject of this suit began in February 1994, when Kronquest, with whom Van Alstyne had worked for some 10 years without incident, held her hand, kissed her on the cheek, and began to suggest that the two enter into a personal relationship. (Undisputed Facts ¶ 18–20, 22–23). Van Alstyne, though aware that Company president William Ackerley had fired a former sales manager at the station for sexual harassment (Undisputed Facts ¶ 49), made no complaint to the Company about Kronquest's amorous suggestions in the spring or summer of 1994 (Undisputed Facts

¶ 48). She first broached the subject to the Company's management, headquartered in Seattle, Washington, in late October 1994, after the October 17 or 18 conversation (discussed above) in which Van Alstyne says Kronquest told her to "[v]acate [her] job." Following that conversation, Van Alstyne continued to work, realizing that she had not been fired; but a week or two later she telephoned William Ackerley in Seattle to complain that Kronquest had fired her and wanted to have a personal relationship with her. (Undisputed Facts ¶¶ 55–58.) In that conversation, Van Alstyne did not use the words "sexual harassment" (Undisputed Facts ¶ 59), and she did not mention "hugs or kisses or handholding or anything physical" (Van Alstyne Dep. at 473–74).

Q. You simply told him that, in your words, you thought your boss wanted to have a personal relationship with you, right?

A. That's correct.

(*Id.* at 474.)

There is no dispute that in that conversation, William Ackerley told Van Alstyne he would look into the situation and call her back, and that he did in fact call her back. (Undisputed Facts ¶ 60.) He asked her to talk to Kronquest; but Van Alstyne's attorney wrote Ackerley the next day, stating that it was not appropriate for Van Alstyne to meet with Kronquest. (Undisputed Facts ¶ 61, 62.) On the following day, the Company's general counsel Eric Rubin called Van Alstyne's attorney to set up a meeting with Van Alstyne (Undisputed Facts ¶ 63); Rubin met with Van Alstyne and her attorney on October 26 (Undisputed Facts ¶ 65). There is no dispute that Rubin's call and his trip from Seattle to Syracuse to meet with Van Alstyne were "prompt response[s]" by top management to her complaints. (Undisputed Facts ¶ 64; Van Alstyne Dep. at

478–79, 481.) At the October 26 meeting, Van Alstyne told Rubin of Kronquest's marriage proposals and hand-holding, etc. (Van Alstyne Dep. at 481.) That meeting was "the first time that [she] ever told anybody from the company the details of what [she] considered to be sexual harassment." (*Id.*)

Following Rubin's meeting with Van Alstyne, Kronquest was summoned to Seattle to be interviewed. (Undisputed Facts ¶ 66.) Within 10 days after Rubin had come to Syracuse to meet with Van Alstyne (Undisputed Facts ¶ 67), and just a few days after the company had interviewed Kronquest in Seattle (Undisputed Facts ¶ 71), William Ackerley and the Company's human resources director Debbie Stednick came from Seattle to Syracuse and met with Van Alstyne. (Undisputed Facts ¶ 67.) There is no dispute that at that meeting, William Ackerley told Van Alstyne

> that (1) Debbie Stednick would be checking in with her on a regular basis to see how things were going; (2) Steve Kronquest had not and could not terminate her; (3) Denis Curley would be coming on a quarterly basis to see how things were going; (4) Kronquest was not to meet with Van Alstyne without a third party present; (5) Kronquest was ... unequivocally to avoid a personal relationship of any kind with Van Alstyne; (6) the company would pay for counseling, if Ms. Van Alstyne desired.

(Undisputed Facts ¶ 68.) There is also no dispute that "Mr. Ackerley asked Ms. Van Alstyne if there was anything else she wanted them to do; she said there was nothing else. She had no other suggestions." (Undisputed Facts ¶ 69; *see also* (Van Alstyne Dep. at 491 ("Q. Was there anything else that you wanted the company to do at that point in time that they refused to do? A. No.")).)

As to the outcome of her meeting with William Ackerley and Stednick, Van Alstyne testified as follows:

> Q. Then after that time, isn't it a true fact that Steve Kronquest never again approached you with any kind of attempt to engage in a personal relationship?
>
> A. That's correct.
>
> Q. With any hugs or kisses, correct?
>
> A. Correct.
>
> Q. With any handholding?
>
> A. Correct.
>
> Q. All of these things, these things that you called sexual harassment, stopped after November 7, right?
>
> A. I believe so.

(Van Alstyne Dep. at 496.) And it is undisputed that "[t]he end result of Ms Van Alstyne's complaint and the company's actions was that Mr. Kronquest was asked to resign in February [1995]." (Undisputed Facts ¶ 73.)

In light of these admitted and undisputed facts, no rational factfinder could fail to conclude that the Company took prompt and effective action that remedied the situation of which Van Alstyne had complained.

■■■ Although Van Alstyne contends that the Company should not be allowed to prevail on this basis because corrective employer action is an affirmative defense and was not raised in the Company answer, we disagree. The Company filed its answer some two years prior to the Supreme Court's decisions in *Burlington* and *Faragher* discussing corrective employer action as an affirmative defense. The function of the pleadings is to give opposing parties notice of the facts on which the pleader will rely, and, in the absence of prejudice to the opposing party, the court may allow the pleadings to be amended to

conform them to t he evidence at any time, even after judgment, *see* Fed.R.Civ.P. 15(b). Plainly Van Alstyne had notice of the factual assertions underlying the Company's contention that it took appropriate action in response to her complaint of sexual harassment; those facts were set out in detail in the Company's statement of undisputed facts in support of its motion for summary judgment. And, as indicated above, they were largely admitted by Van Alstyne. The interests of justice would hardly be served by disregarding Van Alstyne's admissions that the Company took prompt remedial action in response to her complaint against Kronquest, that she had no suggestions for additional action by the Company, and that after the Company's prompt action "Kronquest never again approached [Van Alstyne] with any kind of attempt to engage in a personal relationship," and "[a]ll of ... these things that [she] called sexual harassment, stopped...." (Van Alstyne Dep. at 496.)

We have considered all of Van Alstyne's contentions on this appeal and have found in them no basis for reversal. Having upheld the dismissal of the Title VII claims, we see no reason to disturb the district court's refusal to exercise supplemental jurisdiction over her state-law claims. The judgment of the district court is affirmed.