Elma MANLIGUEZ, Plaintiff,

v.

Martin and Somanti JOSEPH,
Defendants.

No. 01–CV–7574 (NGG).

United States District Court,
E.D. New York.

Aug. 20, 2002.

Sameer Mahendra Ashar, New York City, for Plaintiff.

Regina E. Dicocco, Perry & Campanelli, Garden City, NY, Mercedes Colwin, Deborah A. Swindells Donovan, Labbate, Balkan, Colavita & Contini, LLP, New York City, for Defendants.

## MEMORANDUM AND ORDER

GARAUFIS, District Judge.

Defendants Martin and Somanti Joseph ("Defendants"), pursuant to FED. R. CIV. P. 12(b)(6), move to dismiss as time-barred Plaintiff Elma Manliguez's ("Plaintiff" or "Manliguez") claims of involuntary servitude, Alien Tort Claims Act ("ATCA") violation, intentional infliction of emotional distress, and conversion. Defendants also move to dismiss Plaintiff's claims of conversion and deprivation of overtime compensation for failing to state grounds upon which relief may be granted. Finally, Defendants move to dismiss Plaintiff's claims of fraudulent inducement and negligent representation as not pled with particularity for purposes of FED. R. CIV. P. 9(b) ("Rule 9(b)"). Plaintiff opposes Defendants' motion in its entirety.

For the reasons discussed below, Defendants' motion to dismiss is denied in its entirety.

## I. Factual Background and Procedural History

For purposes of this motion to dismiss, Plaintiff's allegations are accepted as true and any reasonable inferences are drawn in favor of Plaintiff.

Plaintiff, a native of the Philippines, had been employed by Defendants for one year as a domestic servant in Malaysia when Defendants decided to return to the United States in November 1998. (Compl.¶¶ 15, 23.) Defendants led Plaintiff to believe that they were simply visiting the United States. Thus, in October 1998, Defendants took Plaintiff to the United States embassy in Malaysia to request a tourist visa for her.[1] (Id. ¶¶ 9, 12.) Defendant Martin Joseph instructed her to inform the United States embassy that she was "seeking a visa to go on vacation." (Id. ¶ 13.) When the Embassy officials asked about her wages, Defendant Martin Joseph directed her to answer that "she was paid regularly by her employer." (Id.) Plaintiff alleges that once the visa had been processed, Martin Joseph went to pick it up and purchased her ticket to New York. (Id. ¶ 14.) Defendants never returned Plaintiff's passport after arriving in the United States, even though she requested its return during her stay in the United States.[2] (Id. ¶ 29.)

Plaintiff alleges that Martin Joseph told her that Defendants were moving back to the United States permanently only after she found a moving van at the house in

---

1. In April 1998, Defendants had obtained Manliguez's passport from her employment agency, which held her passport as per her contract. (Id. ¶ 10.)

2. When Plaintiff requested her passport upon arrival in the United States, Defendants claimed that it was lost. (Id. ¶ 30.) Plaintiff again requested her passport in November 1999 and Defendants refused to turn it over. (Id. ¶ 86.)

October 1998. (*Id.* ¶ 15.) Although Plaintiff protested against moving to the United States because of family responsibilities, Defendants refused to pay for her plane ticket home (as required by her employment contract) and pressured her to accompany them. (*Id.* ¶¶ 16–18.) In October 1998, Defendant Martin Joseph promised to pay Plaintiff $180 per month for her work in the United States. (*Id.* ¶¶ 21–23.) Faced with nonexistent job prospects due to the economic crisis in Malaysia, she accompanied Defendants to New York on November 1, 1998.

Upon arrival, Defendants, their three children, and Manliguez moved into a two-bedroom apartment in Wexford, New York. Manliguez shouldered substantial household responsibilities. She provided 24-hour care to Defendants' youngest daughter Nicole, even sharing a twin bed with her because otherwise "the child prevented them [Defendants] from getting any rest." (*Id.* ¶ 52.) Manliguez also nursed Nicole when she was sick and comforted her when she awoke crying at night. (*Id.*) Additionally, Plaintiff woke and dressed Defendants' two other children, prepared their meals, cleaned their rooms, and bathed both Nicole and Meghan, Defendants' other daughter. (*Id.* ¶ 50.) Her other daily household responsibilities included: making the beds, vacuuming rugs and sweeping the floors, cleaning the kitchen and bathroom, and ironing. (*Id.* ¶ 53.) She also did the laundry, shampooed the carpets, cleaned the blinds, and changed the sheets. (*Id.* ¶¶ 54–56.) When Defendants moved from their apartment into a house in Hollis, New York, Plaintiff cut the grass, swept the sidewalk, and cleaned the outside windows. (*Id.* ¶ 60.)

Excluding the overnight care she provided the youngest daughter, Plaintiff worked from 4 a.m. to 10:30 p.m. every day, seven days a week. (*Id.* ¶ 49.) On at least two occasions, Defendants woke her up at 3 a.m. to wait on them and their guests. (*Id.* ¶ 64.)

Defendants did not accord Plaintiff simple courtesies during her term of employment. For instance, despite her long days, she often only ate one full meal per day. Plaintiff was only permitted to eat food left over from a previous meal and even if there was extra food, Plaintiff had to eat the oldest food available because Defendants forced her to throw out the remains of the last meal if there was food left over from an earlier meal. (*Id.* ¶ 72.) Moreover, Defendants would not allow Plaintiff to eat at the kitchen table—she had to eat by 'the washing machine in the kitchen or on the floor. (*Id.* ¶ 70.) Finally, Defendants never accounted for Plaintiff when groceries were purchased and reprimanded Plaintiff when she cooked more servings than there were family members. (*Id.* ¶¶ 75–76.) Consequently, Plaintiff "lost a great deal of weight" while working for Defendants in New York. (*Id.* ¶ 67.)

Furthermore, Defendants did not allow Manliguez to take any vacation days, sick days, or significant periods of rest. (*Id.* ¶¶ 65–66.) Defendants also withheld medical care from her for the duration of her employment. (*Id.* ¶ 81.) When Plaintiff was ill, Defendants forced her to work but denied her any medication to fight her illness. (*Id.* ¶ 80.) Defendants paid her only $1,050.00 for her two years of employment. (*Id.* ¶ 27.) Plaintiff, however, never directly received her wages. Rather, they were wired to her bank account in the Philippines for her mother's use. (*Id.*) Consequently, she could not purchase basic necessities such as personal toiletries. (*Id.* ¶ 48.) As a result, she had to resort to using an old pair of underwear, which she washed nightly, as a sanitary napkin. (*Id.*)

Defendants also emotionally and physically isolated Manliguez by limiting her contact with the outside world. Defen-

dants denied her a means of exiting their apartment by withholding the key to the self-locking front door. (*Id.* ¶¶ 35–36.) After moving into their new house in Hollis, New York, they quite literally locked her inside. (*Id.* ¶ 41.) Because the first-floor windows were barred, she had no means of exit without causing herself serious injury. (*Id.* ¶ 40.) When Plaintiff was allowed to leave the Joseph home, Defendant Somanti Joseph monitored Plaintiff's movements either by accompanying her or watching from her from the window. (*Id.* ¶¶ 33, 42.) Defendants refused to allow Plaintiff to attend church with them and prohibited "even supervised interactions with other [people]" in the United States. (*Id.* ¶¶ 43, 46.) Additionally, Defendants allowed Plaintiff only one phone call in the two years she worked for them.[3] (*Id.* ¶ 82.) Finally, Defendants deprived her of mail from her mother. (*Id.* ¶¶ 84–85.) When Plaintiff became suspicious of her lack of mail, she searched the apartment and discovered letters from her mother hidden in a kitchen drawer. (*Id.* ¶ 84.) Plaintiff received her mother's letters only after she asked the basement tenant, Rohit, to deliver her mail directly to her. (*Id.* ¶ 85.)

Throughout the period of her employment, Defendant Martin Joseph verbally abused Plaintiff. He constantly humiliated and insulted her, calling her "stupid" and telling her to "shut up." (*Id.* ¶ 77.) Jonathan, the eldest child, began to follow his father's lead, repeatedly insulting Plaintiff and inflicting further injury.

Eventually, Plaintiff realized that Defendants had no intention of allowing her to leave and that she needed to escape. (*Id.* ¶ 87.) On October 18, 2000, Defendant Somanti Joseph left to pick her mother up from the airport but neglected to take her

handbag, which contained the house keys. (*Id.* ¶ 88.) When Plaintiff realized that the keys had been left behind, she took the keys, unlocked the front door, and left the house. (*Id.* ¶ 89.) Acquaintances picked her up and hid her from the Defendants by transporting her to several safe houses. (*Id.* ¶¶ 90–93.) Frustrated in his attempts to locate her, Defendant Joseph Martin told Rohit that "if she returned to the Defendants, he 'just may kill her.'" (*Id.* ¶¶ 94–95.)

Plaintiff filed her initial complaint on November 13, 2001. She amended the complaint on January 22, 2002.

## II. Discussion

### A. Standard for Motion to Dismiss

In considering a motion to dismiss, the court may consider any written document referenced by the complaint. *See Yak v. Bank Brussels Lambert,* 252 F.3d 127, 130 (2d Cir.2001). In order to grant a motion to dismiss, a court must determine that, based on the complaint and referenced documents, the plaintiff can prove no set of facts which would establish her claim for relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994). When determining whether the plaintiff can prove any set of facts which would entitle her to relief, a court must assume that the allegations in the complaint are true and draw all reasonable inferences in the plaintiff's favor. *See Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); *Kaluczky v. City of White Plains,* 57 F.3d 202, 206 (2d Cir.1995). In deciding such a motion, the "issue is not whether a plaintiff will ultimately prevail, but whether the claimant is

---

**3.** Defendants allowed Plaintiff to make a three-minute phone call after her mother suffered a stroke. (*Id.* ¶ 82.)

entitled to offer evidence to support the claims." *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (quotation marks and citations omitted).

### B. Involuntary Servitude

### 1. Plaintiff States an Involuntary Servitude Claim Under 18 U.S.C. § 1584 [4]

■ The Thirteenth Amendment and its enforcing statute, 18 U.S.C. § 1584 [5], prohibit involuntary servitude. Involuntary servitude is defined as "a condition of servitude in which the victim is forced to work for a defendant by use or threat of physi-

cal restraint or injury or by use of coercion through law or legal process." *United States v. Kozminski,* 487 U.S. 931, 952, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988).

Unlike the Fourteenth Amendment, the Thirteenth Amendment and its enabling statute apply not only to state action but also to private conduct. Defendants charged with involuntary servitude generally face criminal sanctions under section 1584.[6]

■ While section 1584 imposes criminal penalties, it does not expressly provide for a civil remedy.[7] Provision of a criminal penalty, however, does not necessarily pre-

---

**4.** Defendants do not argue that Plaintiff has failed to allege facts sufficient to sustain a claim for involuntary servitude. I address the merits of Plaintiff's involuntary servitude claim, however, in order to determine whether Plaintiff has brought her claim under the Thirteenth Amendment directly or under its enforcing statute, 18 U.S.C. § 1584.

**5.** 18 U.S.C. § 1584 provides:

Whoever knowingly and willfully holds to involuntary servitude or sells into any condition of involuntary servitude, any other person for any term, or brings within the United States any person so held, shall be fined under this title or imprisoned not more than 20 years, or both. If death results from the violation of this section, or if the violation includes kidnapping or an attempt to kidnap, aggravated sexual abuse or the attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title or imprisoned for any term of years or life, or both.

**6.** Although the Second Circuit has not had occasion to address allegations by a domestic servant working under the sort of conditions described by Manliguez, courts in other circuits have held defendants criminally liable for forcing victims to work under similar conditions. In *United States v. Alzanki,* 54 F.3d 994, 998–99 (1st Cir.1995), the First Circuit affirmed the defendant's involuntary servitude conviction, which he had challenged on the basis of insufficient evidence. At trial, the prosecution established that the defendant forced the victim to work fifteen hours a day,

refused to give her adequate nourishment, denied her any means of contact with the world outside the defendant's apartment, assaulted her twice, threatened her on a daily basis, and confiscated her passport. Similarly, in *United States v. Ingalls,* 73 F.Supp. 76, 77–78 (S.D.Cal.1947), a California district court denied the defendant's motion for a new trial and held that the jury had sufficient evidence to convict her of consigning the victim to involuntary servitude. The evidence revealed that the defendant required the servant to perform all the household work without compensation or days off, physically and emotionally abused her, refused to allow her to contact with family and friends and provided her with substandard food and housing.

**7.** The U.S. Supreme Court has yet to recognize that a private cause of action exists for involuntary servitude under the Thirteenth Amendment. *See City of Memphis v. Greene,* 451 U.S. 100, 125, 101 S.Ct. 1584, 67 L.Ed.2d 769 (1981). Although a private right of action may arise directly from violation of a constitutional provision under *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 391, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Court recently clarified that the purpose of providing a cause of action under *Bivens* was to deter federal officers from abusing their constitutional authority, not necessarily to provide an individual with a remedy for the violation of a constitutional right. *See Correctional Services Corporations v. Malesko,* 534 U.S. 61, 122 S.Ct. 515, 521, 151 L.Ed.2d 456 (2001).

clude implication of a private cause of action for damages. A court may imply a private civil cause of action if it determines that Congress, by implication, intended to create one. *See Touche Ross & Co., v. Redington,* 442 U.S. 560, 569, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). When courts have implied such a cause of action, in general, "the statute in question ... prohibited certain conduct or created federal rights in favor of private parties." *Id.*

In the instant case, although section 1584 does not directly address whether or not there exists a private cause of action based on involuntary servitude, the beneficiaries of section 1584's protection are victims of this constitutionally prohibited practice. In the instant case, Plaintiff alleges that she was such a victim. Moreover, the statute is rooted in the Thirteenth Amendment, which confers upon individuals the federal right to be protected from involuntary servitude. Further, recognizing a private civil cause of action for involuntary servitude would be consistent with the underlying legislative purpose of section 1584 because it would provide a victim with a direct and efficient means of protecting his or her rights and deter potential offenders from engaging in behavior that the statute was designed to prohibit.

A Southern District of New York court has held that an implied private right of action exists under section 1584 on alternate grounds. *See Flood v. Kuhn,* 316 F.Supp. 271, 280–82 (S.D.N.Y.1970), *aff'd* 443 F.2d 264 (2d Cir.1971), *cert. granted* 404 U.S. 880, 92 S.Ct. 201, 30 L.Ed.2d 160 (1971), *aff'd on other grounds,* 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972).[8] In *Flood,* the court considered whether a player's required participation in the Major League Baseball reserve system was a form of involuntary servitude. *See id.* at 280. In order to consider this issue, the court first established that federal courts had jurisdiction under 28 U.S.C. §§ 1331 and 1343 to hear an individual plaintiff's civil action based on involuntary servitude. *See id.* Ultimately, however, the court decided that because the player had the option to retire from baseball, he was not compelled to work and thus was not subject to involuntary servitude. *See id.* at 282.

■ Finally, the lack of case law addressing whether there is a private right of action for involuntary servitude is not surprising—instances of involuntary servitude are rarely found in modern American society. Therefore, in sum, I conclude that there exists a private civil cause of action under section 1584 based on involuntary servitude.

■ In the instant case, Plaintiff alleges that Defendants locked her inside their apartment and forced her to work 18½ hours per a day, not including the overnight care she was required to provide to their youngest daughter. (Compl.¶¶ 49, 52.) She further claims that they denied her any extended periods of rest, confiscated her passport, prohibited her from communicating with people outside their immediate family, fed her stale leftovers, denied her the most rudimentary personal hygiene items, and attempted to sever her ties with her mother in the Philippines, among other allegations. (*Id.* ¶¶ 34, 65, 43, 84–85.) These allegations describe acts of barbarism and unrelenting mental brutality reminiscent of the gulag memori-

---

8. Some courts in other circuits have declined to extend civil liability for section 1584 claims. *See Buchanan v. City of Bolivar,* 99 F.3d 1352, 1357(6th Cir.1996); *Turner v. Unification Church,* 473 F.Supp. 367, 375 (D.R.I. 1978). The facts underlying those cases, however, reveal that the claims did not fit the definition of "involuntary servitude" under *Kozminski,* 487 U.S. at 952, 108 S.Ct. 2751.

alized by Aleksandr Solzhenitsyn in his novel entitled *One Day in the Life of Ivan Denisovich.* Consequently, I find that Plaintiff has stated a claim for involuntary servitude and is entitled to pursue civil relief for Defendants' alleged violation of her civil rights.

## 2. Appropriate New York Statute of Limitations

■ Like most civil rights statutes, the involuntary servitude statute, section 1584, does not specify a statute of limitations. If a federal civil rights statute does not provide a statute of limitations, 42 U.S.C. § 1988 directs the courts to borrow one from the most analogous state action. The state limitations period, however, must not "frustrate or interfere with the implementation of national policies ... or be at odds with the purpose and operation of federal substantive law." *North Star Steel Co. v. Thomas,* 515 U.S. 29, 34, 115 S.Ct. 1927, 132 L.Ed.2d 27 (1995).

The Second Circuit has not established which New York statute of limitations applies to an involuntary servitude claim.[9] The U.S. Supreme Court, however, has held that New York's three-year statute of limitations for general personal injury claims is most analogous, and therefore most applicable, to a civil rights claim pursuant to 42 U.S.C. § 1983. *See Owens v. Okure,* 488 U.S. 235, 249–250, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). Previously, the Court had held that, in general, a state's statute of limitations for personal injury provides the applicable limitations period for a section 1983 claim. *See Wil-*

*son v. Garcia,* 471 U.S. 261, 276, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). Acknowledging that New York furnishes two statutes of limitations for personal injury actions—one year for intentional tort and three years for other personal injury claims—the Court clarified its earlier holding as applied to New York, noting that the longer of the two more faithfully fulfills the federal interest in providing an effective remedy for civil rights violations than the more restrictive one-year limit. *See Owens,* 488 U.S. at 249–250, 109 S.Ct. 573. New York courts have extended *Owens* and applied the three-year limitations period to other civil rights claims. *See Blankman v. County of Nassau,* 819 F.Supp. 198, 206 (E.D.N.Y.1993), *aff'd* 14 F.3d 592 (2d Cir.1993) (extending *Owens* to § 1985 claims); *Daniel v. Safir,* 175 F.Supp.2d 474, 479 (E.D.N.Y.2001) (recognizing that New York's three-year limitations period governs §§ 1981, 1982, 1983, and 1985 claims).

Defendants, however, contend that because Plaintiff's claim is most analogous to a false imprisonment claim, rather than a civil rights claim, *Owens* and its progeny are inapplicable[10] and the one-year limitations period that New York applies to false imprisonment claims should be used.

I conclude that Plaintiff's involuntary servitude claim is most analogous to a civil rights claim for purposes of choosing the appropriate statute of limitations. Classifying Plaintiff's claim as a false imprisonment claim would not address Plaintiff's forced labor or its constitutional implica-

---

9. In fact, this court's research has revealed only one court that directly addressed the question of which state statute of limitations should be applied to an involuntary servitude claim. In *Townsend v. Treadway,* 1974 WL 1256 (M.D.Tenn.1973), the court held that a state statute of limitations explicitly governing civil rights actions was the most appropriate for involuntary servitude claims pursuant to

the Thirteenth Amendment and its enabling statutes. *Id.* at *3.

10. Although Defendants do not mention *Owens* explicitly, they argue that Plaintiff's claim is more analogous to a tort claim than a civil rights claim and therefore implicitly argue that *Owens* and its progeny are inapplicable.

tions. Therefore, I am applying the three-year statute of limitations for civil rights claims.

Plaintiff asserts that she was subject to involuntary servitude until October 18, 2000. She filed her claim on November 13, 2001. Because she filed her claim within the three-year statute of limitations applicable to civil rights violations, I decline to dismiss Plaintiff's involuntary servitude claim due to untimeliness.

### C. Statute of Limitations for the Alien Tort Claims Act

█ The Alien Tort Claims Act ("ATCA") allows aliens to bring civil actions in federal courts for tort claims based on violations of international law or United States treaties. 28 U.S.C. § 1350. The ATCA does not specify a statute of limitations. 28 U.S.C. § 1350. As stated above, when a federal statute does not provide a statute of limitations, the Supreme Court has instructed lower courts to apply the statute of limitations from the most analogous state law unless a federal law clearly provides a closer analogy and federal interests are better served by applying the federal statute of limitations. *See id.*

It is well-established that the ten-year statute of limitations of the Torture Victims Protection Act ("TVPA") applies to ATCA claims. *See e.g., Papa v. United States,* 281 F.3d 1004, 1012 (9th Cir.2002); *Cabiri v. Assasie–Gyimah,* 921 F.Supp. 1189, 1195–96 (S.D.N.Y.1996). As the Ninth Circuit has explained, federal courts apply the TVPA limitations period to ATCA claims because ATCA claims require careful examination of the international obligations of the United States and often entail preparation that would be stymied by requiring imposition of the time restrictions of state tort actions. *See Papa,* 281 F.3d at 1012. Therefore, in accordance with the consensus of federal courts that the TVPA is the both the most

analogous statute and the one that best accommodates federal policies, I find that the TVPA ten-year statute of limitations applies to Plaintiff's ATCA claim.

Plaintiff filed her ATCA claim on November 13, 2001, well within the ten-year window provided by the TVPA. Accordingly, I decline to dismiss Plaintiff's ATCA claim on the grounds that it is untimely.

### D. Statute of Limitations for Intentional Infliction of Emotional Distress

█ In order to sustain a claim for intentional infliction of emotional distress under New York law, a plaintiff must show that a defendant's conduct was "so outrageous in character and so extreme in degree, as to be regarded as atrocious, and utterly intolerable in a civilized community." *Fischer v. Maloney,* 43 N.Y.2d 553, 402 N.Y.S.2d 991, 993, 373 N.E.2d 1215 (1978); *Howell v. N.Y. Post Co., Inc.,* 81 N.Y.2d 115, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699 (1993). An intentional infliction of emotional distress claim is subject to a one-year statute of limitations. When the alleged offense is part of an ongoing pattern of harassment, the continuing tort doctrine "permit[s][a] plaintiff to rely on wrongful conduct occurring more than one year prior to commencement of the action, so long as the final actionable event occurred within one year of the suit." *Shannon v. MTA Metro–North R.R.,* 269 A.D.2d 218, 704 N.Y.S.2d 208, 209 (2000).

█ In the instant case, Plaintiff alleges that Defendants forced her to work 24 hours a day, physically and emotionally isolated Plaintiff from friends and family, deprived her of sleep and food, and verbally abused her from November 1, 1998 until she escaped on October 18, 2000. (Compl.¶¶ 49, 52, 64, 72, 77.)

Defendants contend that the statute of limitations for Plaintiff's intentional inflic-

tion of emotional distress claim has expired because Plaintiff filed her suit more than a year after she left Defendants' house. (Defs.' Mem. in Supp. Mot. to Dismiss at 10.) Plaintiff, however, claims that Defendants continued to harass and threaten her well into December 2000. (Pl.'s Mem. in Opp'n Defs.' Mot. to Dismiss at 12.)

I find that Plaintiff has demonstrated an issue of material fact as to whether Defendants continued to threaten Plaintiff well into the one-year limitations period and whether the threats were part of a continuous pattern of harassment and intimidation. Therefore, Plaintiff's allegations are sufficient to support a cause of action for intentional infliction of emotional distress and not time-barred.

### E. Conversion

 Conversion is defined as "any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property." *Meese v. Miller,* 79 A.D.2d 237, 436 N.Y.S.2d 496, 500 (1981). In situations where the defendant's initial possession was lawful, the three-year statute of limitations begins to run when the true owner becomes aware that the possessor's actions are hostile to her rights. *See D'Amico v. First Union Nat'l Bank,* 285 A.D.2d 166, 728 N.Y.S.2d 146, 151 (2001). Such hostility may be demonstrated by the true owner's demand for the return of her property and the possessor's refusal to return it. *See MacDonnell v. Buffalo Loan, Trust and Safe Deposit Co.,* 193 N.Y. 92, 101, 85 N.E. 801 (1908).

#### 1. Passport

 Defendants move to dismiss Plaintiff's conversion claim with respect to her passport as time-barred. (Defs.' Mem. in Supp. Mot. to Dismiss at 12.) Defendants argue that the statute of limitations began to run when Defendants initially refused to return Plaintiff's passport in November 1998, more than one year before Plaintiff filed the instant suit on November 13, 2000.

I decline to dismiss Plaintiff's conversion claim with respect to her passport as untimely, however, because I conclude that the statute of limitations did not begin to run until November 1999, when Defendants refused for a second time to return the passport. Defendants' initial possession of Plaintiff's passport was necessary to secure her visa and make other travel arrangements and thus was lawful. (Compl. ¶ 14.) Therefore, the statute of limitations for Plaintiff's conversion claim did not begin to run until Plaintiff realized Defendants' possession of the passport was hostile. *See D'Amico,* 728 N.Y.S.2d at 151. When Plaintiff initially asked for the return of her passport in November 1998, Defendants did not actually refuse her request. (*Id.* ¶ 30.) Instead, Defendants claimed the passport was "lost." (*Id.*) Because Plaintiff did not realize that Defendants did not intend to return her passport, she did not perceive Defendants' possession as hostile. One year later, however, Plaintiff again asked for her passport and Defendants refused her request. (*Id.* ¶ 86.) Thus, only after Defendants' second refusal to return the passport did Plaintiff recognize that Defendants' possession was hostile. Therefore, I find that the cause of action for conversion of the passport began to accrue only when Defendants denied Plaintiff's second request for her passport. Accordingly, because Plaintiff filed on November 13, 2000, less than one year after Defendants' second refusal to return the passport, I conclude Plaintiff's conversion claim with respect to her passport is not time-barred.

## 2. Mail

■ Defendants seek to dismiss Plaintiff's conversion claim with respect to her mail because the Complaint alleges that Defendants committed conversion by not returning "other property" without specifically identifying the missing property. (Defs.' Mem. in Mot. to Dismiss at 17–18.) Because she does not allege ownership of "specific and identifiable property," Defendants argue that Plaintiff has not stated a valid claim for conversion under New York law. *Van Brunt v. Rauschenberg*, 799 F.Supp. 1467, 1473 (S.D.N.Y.1992).

It is well-established, however, that a complaint must survive a motion to dismiss unless "it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir.1997). The function of the pleadings is to provide the other party with notice of the factual basis upon which the claims presented in the complaint rest. *See Van Alstyne v. Ackerley Group, Inc.*, 8 Fed.Appx. 147, 154 (2d Cir.1997). Here, it is clear from the facts alleged in the Complaint that "other property" refers to Defendants' alleged misappropriation of Plaintiff's mail. (Compl.¶¶ 83–84.)

Plaintiff alleges that although her mother had reassured her that she had sent several letters, Plaintiff did not receive any letters during her time in New York. (Compl.¶ 83.) As a result, Plaintiff suspected that Defendants were denying her the mail addressed to her that came to Defendants' apartment. (*Id.* ¶ 84.) Her suspicions were confirmed when she discovered a letter from her mother hidden in the kitchen drawer. (*Id.*)

Mail addressed to the Plaintiff clearly belonged to her. Thus, Plaintiff has established that she has a superior possessory right to her mail. *See Meese*, 436 N.Y.S.2d at 500. Defendants' alleged refusal to deliver Plaintiff's mail interfered with Plaintiff's property right. Based on Plaintiff's allegations, I find that Plaintiff has stated a valid claim for conversion.

## F. Overtime Compensation

■ Under the Fair Labor Standards Act ("FLSA"), workers receive overtime compensation of 1½ times their hourly rate for each hour in excess of 40 hours per week. 29 U.S.C. § 207(a)(1). FLSA, however, excludes certain classes of employees from receiving such overtime compensation. With respect to domestic employees, the statute states, in relevant part:

> Maximum hour requirements. The provisions of section 7 [29 U.S.C. § 207] shall not apply with respect to ... any employee who is employed in domestic service in a household and who resides in such household.

29 U.S.C. § 213(b)(21).

Although FLSA does not define "domestic service," C.F.R. § 552.3 clarifies that "domestic service employment" consists of "services of a household nature performed by an employee in or about a private home (permanent or temporary) of the person by whom he or she is employed." C.F.R. § 552.3. The regulation offers several illustrations of such employees, including "cooks ... maids, housekeepers, governesses, nurses ... laundresses ... [and] caretakers." C.F.R. § 552.3. Thus, under federal law, Plaintiff would be considered a "domestic servant" and therefore would not be entitled to overtime compensation.

■ FLSA does not, however, preempt state regulation of wages and overtime if the state's standards are more beneficial to workers. Section 218(a) of FLSA specifically states:

> No provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or

municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter or a maximum workweek lower than the maximum workweek established under this chapter.

29 U.S.C.A. § 218. *See also Pettis Moving Co., Inc., v. Roberts,* 784 F.2d at 441 ("Section 218(a) of the FLSA explicitly permits states to set more stringent overtime provisions than the FLSA." (citation omitted)); *Overnite Trans. Co. v. Tianti,* 926 F.2d 220, 222 (2d Cir.1991) (affirming *Pettis* and further noting that "every Circuit that has considered the issue has reached the same conclusion—state overtime wage law is not preempted by . . . the FLSA." (citations omitted)).

New York law, unlike FLSA, awards reduced overtime compensation for domestic employees:

> [A]n employer shall pay employees subject to the exemptions of section 13 of the Fair Labor Standards Act, as amended, except employees subject to section 13(a)(2) and (a)(4) of such act, overtime at a wage rate of 1½ times the basic minimum hourly rate.

N.Y. Comp.Codes R. & Regs. tit. 12, § 142–2.2. *See also Ballard v. Cmty Home Care Referral Serv., Inc.,* 264 A.D.2d 747, 695 N.Y.S.2d 130, 131 (1999) (holding that the regulation limited overtime compensation for home health care aides and other similarly situated employees (e.g., domestic employees) to 1½ times the state minimum wage rather than the 1½ times the worker's hourly wage).

Plaintiff alleges that she worked at least 18½ hours per day and was on call 24 hours per day. (Compl.¶¶ 49, 52, 64.) She claims that she did not receive overtime compensation for the extra hours she worked. (*Id.* ¶ 125.) Therefore, for purposes of this motion to dismiss, I find that Plaintiff has stated a claim for overtime compensation under New York law.

## G. Fraudulent Inducement and Negligent Misrepresentation Claims

### 1. Standard for Pleading with Particularity

Rule 9(b) provides:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Rule 9(b)'s primary purpose is to ensure that the complaint provides the defendant "with fair notice of the plaintiff's claim and the factual basis upon which it is based." *Ross v. Bolton,* 904 F.2d 819, 823 (2d Cir. 1989).

 The Second Circuit has established that a complaint specifying the "time, place and nature of the misrepresentations" made by the defendant satisfies Rule 9(b)'s particularity requirement. *Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir.1986). Allegations of knowledge and scienter, however, do not require great specificity because "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind." *Conn. Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir. 1987). Instead, the Second Circuit requires that the complaint "specifically plead events which give rise to a strong inference that the defendant had an intent to defraud, knowledge of falsity, or a reckless disregard of the truth." *Id.* (quotation marks and citation omitted).

In accordance with Rule 9(b), Plaintiff has specified the time, place and nature of the alleged misrepresentations that form the basis of her fraudulent inducement and negligent representation claims. (Compl.¶¶ 22, 86.) Viewed in their totality, the facts alleged in Plaintiff's complaint

give rise to a strong inference that Defendants either intended to defraud Plaintiff, knew their statements were false, or recklessly disregarded the truth of their statements. *See Conn. Nat'l Bank*, 808 F.2d at 962. Thus, Plaintiff's complaint provides Defendants with notice of Plaintiff's claim and the factual basis upon which it rests, and therefore satisfies the requirements of Rule 9(b). *See Ross*, 904 F.2d at 823.

## 2. Fraudulent Inducement

■ In order to state a claim for fraudulent inducement under New York law, a plaintiff "must show [a] misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *Shea v. Hambros*, 244 A.D.2d 39, 673 N.Y.S.2d 369, 373 (1998).

■ Plaintiff alleges that Defendants made several misrepresentations in order to overcome her reservations about leaving Malaysia. First, Defendants secured Plaintiff's passport and visa through deception. They led her to believe that they needed her travel documents to make arrangements for a simple visit to the United States when they were actually planning a permanent move. (Compl.¶¶ 9, 12, 15.) Next, Defendants promised to pay Plaintiff $180 per month and purchase her plane ticket back to the Philippines if she worked for them for a year. (*Id.* ¶¶ 22, 86.) Plaintiff claims that Defendants made these misrepresentations in order to induce her to accompany them to the United States and that Defendants understood that she would rely on their statements to decide whether to leave Malaysia. Plaintiff further avers that Defendants made

these statements with no intention of complying with them. (*Id.* ¶ 143.) Plaintiff alleges that she had no reason to disbelieve Defendants and had no other source of information regarding U.S. working conditions and therefore justifiably relied on Defendants' representations in deciding to move to the United States. (*Id.* ¶ 22–23.) Finally, Plaintiff alleges that she has suffered both emotional and financial injuries. (*Id.* ¶ 145.) After reviewing Plaintiff's allegations, I find that she has stated a claim for fraudulent inducement.

## 3. Negligent Misrepresentation

■ In order to state a claim for negligent representation, a plaintiff must allege that:

(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

*Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 20 (2d Cir.2000). In order to establish a "special relationship" for purposes of a negligent representation claim, a plaintiff must establish that the relationship with the defendants involved a closer degree of trust or confidence than an ordinary buyer-seller relationship involving arms-length business transactions. *See Pappas v. Harrow Stores, Inc.*, 140 A.D.2d 501, 528 N.Y.S.2d 404, 407 (1988). Furthermore, the alleged misrepresentations must be factual in nature, not opinions of value or expressions of future ex-

pectations. *See Bango v. Naughton,* 184 A.D.2d 961, 584 N.Y.S.2d 942, 944 (1992).

■ Plaintiff alleges that she and Defendants had a "special relationship" that involved daily interactions regarding household and child-rearing responsibilities. (Compl.¶ 139.) This type of relationship involved a degree of trust not present in ordinary buyer-seller transactions conducted at arms-length. Next, Plaintiff claims that Defendants negligently misrepresented her living conditions in the United States in order to persuade her to leave Malaysia. (*Id.*) Defendants made their statements with the understanding that they would be used by Plaintiff to decide whether she should leave Malaysia. (*Id.* ¶¶ 21–22.) Plaintiff relied on their representations and left Malaysia for the United States. (*Id.* ¶¶ 22–23, 139.) As a result of Defendants' conduct in New York, Plaintiff claims that she has suffered emotional injuries and economic losses. (*Id.* ¶ 145.) Consequently, I find that Plaintiff's allegations are sufficient to sustain a claim of negligent misrepresentation.

### III. Conclusion

For the reasons discussed above, Defendants' motion to dismiss is hereby DENIED in its entirety.

SO ORDERED.